**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________

WEBBANK,

Plaintiff,

v.

JULIE ANN MEADE, in her official capacity as Administrator of the Uniform Consumer Credit Code for the State of Colorado,

Defendant.

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

1. Plaintiff WebBank brings this Complaint for declaratory and injunctive relief to protect its federally authorized lending power from Defendant's interference. Defendant's pending enforcement action against WebBank's partner, which attempts to impose state-law requirements on loans that WebBank originates, directly interferes with WebBank's core lending power and is foreclosed by federal law.

## INTRODUCTION

2. WebBank is a federally regulated bank, federally insured by the Federal Deposit Insurance Corporation ("FDIC"), and chartered by the state of Utah. WebBank lends to borrowers on a uniform, nationwide basis, using the authority provided by Section 27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d. Section 27 expressly preempts the patchwork of individual state restrictions on interest rates and late fees that otherwise would preclude a uniform nationwide credit program.

3. To reach borrowers across the country, WebBank contracts with marketing and servicing partners, including Avant, Inc., which operate online platforms through which applicants can apply to WebBank for loans. Like other banks, WebBank sells loans that it originates to free up its balance sheet to make additional loans.

4. Federal and state bank examiners regularly examine WebBank's balance sheet, records, and lending practices to ensure the safety and soundness of the bank and the compliance of its operations, including loans that it has sold to third parties, with federal and Utah law. The FDIC, WebBank's primary regulator, has acknowledged the important role that bank partnership programs such as WebBank's can play in providing credit to consumers and benefitting the economy.

5. On January 27, 2017, Julie Ann Meade, the Colorado Administrator of the Uniform Consumer Credit Code (the "Administrator") filed suit against Avant, Inc., and its affiliate Avant of Colorado, LLC (together, "Avant"), which is now pending as civil action 1:17-cv-00620 in this Court (the "Enforcement Action"). The Administrator asserts that loans to Colorado residents that WebBank originates and sells to Avant as part of WebBank's lending program are subject *not* to the federal and Utah laws that apply to WebBank, but to Colorado state laws about interest rates and charges for late fees. The Administrator similarly asserts that a choice-of-law clause in WebBank's loan agreements with Colorado residents, which selects Utah law, thereby violates Colorado law. Through the Enforcement Action, the Administrator seeks to prohibit WebBank from selling to Avant any loans that WebBank makes to Colorado residents unless WebBank conforms the terms of those loans to the restrictions on interest rates, delinquency charges ("late fees"), and choice-of-law that Colorado state law imposes. *See*

Sections 5-1-201(8), 5-2-201, 5-2-203 of the Colorado Revised Statutes ("Colorado's Interest Rate Laws").

6. The Administrator attempts to avoid preemption by bringing suit only against WebBank's partner, Avant, but the suit nonetheless directly attacks WebBank's lending program and WebBank's exercise of core banking powers that Congress, through the FDIA, has provided to state-chartered banks. To begin with, the Enforcement Action compromises WebBank's federally protected right under Section 27 of the FDIA to lend nationwide on uniform terms for interest rates and late fees.

7. The Enforcement Action also attacks WebBank's federally protected authority—no less than a national bank's authority—not only to originate loans to borrowers nationwide under the terms for interest rates and late fees permitted by its home state, but to sell those loans to third parties with the assurance that these original terms of the loan will remain valid after the sale. The "valid-when-made" rule is a cardinal rule of banking law that ensures that a loan that is valid against an interest-rate challenge when the loan is made, remains valid against any such challenge after the loan is sold. Congress incorporated the valid-when-made rule into the national banking laws in 1864 and extended it to state-chartered banks in 1980. The Administrator's attack on the valid-when-made rule therefore challenges a pillar of the interstate banking system.

8. The Enforcement Action is thus barred by two principles that lie at the heart of federal banking law. First, only federal law governs the interest rates and late fees that may be charged when a bank extends credit to consumers nationwide. The Administrator appears to concede the existence of this principle. *See* Enforcement Action Am. Compl. ("Am. Compl.") ¶ 30.

9. Second, interest-rate terms that are valid when a loan is made remain valid after the loan is sold. Sections 85 and 86 of the National Bank Act ("NBA"), 12 U.S.C. §§ 85, 86, and the corresponding and materially identical provision for state-chartered banks, Section 27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d, establish a uniform federal rule of interest-rate and late-fee regulation, preserve the longstanding valid-when-made rule, and completely preempt actions based on state interest-rate laws.

10. WebBank brings this action to secure relief for the injury that the Enforcement Action is inflicting now and will continue to inflict upon WebBank. WebBank cannot leave its dispute with the Administrator to be resolved only in the context of the Enforcement Action against Avant, because the impact of that action is not limited to Avant. The Enforcement Action has already caused and continues to cause harm to WebBank as well.

11. For example, because of the Enforcement Action, WebBank has ceased originating loans through its program with Avant to Colorado residents, and thereby has suffered and will continue to suffer an irreparable financial loss.

12. More broadly, the Enforcement Action also threatens WebBank's business and lending programs nationwide. WebBank has founded its business on the lending authority that Congress has provided to state-chartered banks in Section 27 of the FDIA, subject to the examination and oversight of its federal and home state regulators. Because limits on interest rates and late fees vary widely from state to state, the Enforcement Action interferes with WebBank's right under federal law to lend nationwide on a uniform basis. The Enforcement Action creates new risk and uncertainty for WebBank and for its partners over the legal foundation of WebBank's business model.

13. WebBank therefore seeks a declaratory judgment that the Administrator's application of Colorado's Interest Rate Laws to loans originated by WebBank, no matter whether WebBank holds those loans or sells them to its partners and servicers, is preempted by Section 27 of the FDIA, and appropriate injunctive relief.

**JURISDICTION AND VENUE**

14. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 as this case arises under the Constitution and laws of the United States, in particular the Supremacy Clause of the Constitution, and Section 27 of the FDIA. This Court is authorized to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Administrator resides in Colorado and a substantial portion of the events giving rise to this action occurred within this judicial district.

**PARTIES**

16. WebBank is an FDIC-insured, Utah-chartered industrial bank, which is headquartered in Salt Lake City, Utah. WebBank offers a wide range of credit programs, both for consumers and for business purposes, including installment loans, credit cards, and other lines of credit. It also accepts deposits and participates in syndicated credit facilities.

17. WebBank retains some of the loans that it originates. It sells many of its loans to various partners, and contracts with those partners, including Avant, to service the loans on WebBank's behalf. In each of these lending programs, WebBank originates the loan through a contract that WebBank makes directly with the consumer. These consumer contracts clearly state that WebBank is the lender. WebBank holds each loan for a period of time, and may sell the loan

to one of its partners. When WebBank sells a loan, WebBank may retain some portion of economic interest in the performance of the loan, which WebBank receives as a monetary payment if and as the loan is repaid. WebBank also bears continuing regulatory accountability for each loan.

18. WebBank works with partners to expand the scope of the financial products it is able to deliver to borrowers. Each of WebBank's marketing and servicing partners is a technology-focused company, with expertise in developing and implementing technology that markets and facilitates the origination of loans. WebBank, for its part, has expertise in monitoring and oversight of lending programs—particularly maintaining compliance with the complex set of laws that govern credit programs—both at the time when it makes a loan and when the loan is being serviced. Working with its marketing and servicing partners, WebBank is able to draw upon the complementary expertise of its partners to offer loan programs that, acting alone, it could not offer independently. Moreover, by selling loans that it originates, WebBank is able to expand significantly the scope of its lending programs as compared to what it could offer if it had to retain all of its originated loans on its own balance sheet.

19. Defendant Julie Ann Meade is the State of Colorado's current Administrator of the Uniform Consumer Credit Code, and is named in her official capacity. As the Administrator, she is charged with enforcing the Colorado state laws that are at issue in this action, including Colorado's Interest Rate Laws, and is the named plaintiff in the Enforcement Action.

## FACTUAL BACKGROUND

### I. WEBBANK'S PROGRAMS FOR COLORADO CONSUMERS

20. WebBank lends to borrowers in all 50 states, the District of Columbia, and U.S. territories, relying upon a number of different partners and programs to aid it in marketing and servicing the loans it issues.

21. Although WebBank keeps some of the loans that it originates, it does not market or service most of the loans it originates, or hold those loans on its balance sheet. Instead, WebBank depends upon its marketing and servicing partners to assist it in performing those functions.

22. WebBank has lending programs with other partners besides Avant that allow WebBank to serve borrowers in Colorado and in other states. In all of WebBank's programs for borrowers, both in Colorado and nationwide, WebBank is always the lender named in the relevant credit agreements under which the loans are made; WebBank fully funds the loans at issue using its own money; and WebBank holds the credit receivables for a certain number of days. After selling the loan and the servicing obligations to the relevant program partner, WebBank today continues to share in the financial upside of the program based on the amount of principal and interest collected.

23. WebBank also bears a significant and continuing risk with respect to each loan. WebBank's regulators—the FDIC and the Utah regulators—recognize WebBank as the lender and hold WebBank responsible for the compliance of the loans with all applicable legal requirements. WebBank's compliance responsibility is ongoing, and continues even after a loan is sold.

24. Without the assistance of its marketing and servicing partners such as Avant, WebBank would be unable to offer loans to residents of Colorado.

25. Avant operates as a technology service provider to WebBank in the origination process, providing an online platform through which WebBank is able to receive loan applications and make fully amortizing consumer installment loans for personal, family, or household purposes pursuant to WebBank's credit policy, in amounts ranging from $1,000 to $35,000, with loan terms ranging from two years to five years, and with maximum annual percentage rates not exceeding 36%.

26. With respect to those loans purchased by Avant from WebBank, Avant maintains some of those loans for its own investment, places some of those loans into securitizations where interests are sold to third-party investors, and sells some whole loans directly to third-party investors.

27. WebBank today, and at all times since August 1, 2016, retains an economic interest in all loans originated through the Avant platform, and is entitled to a portion of the borrower payments. WebBank also retains an interest in ensuring that all loans are serviced and collected in compliance with laws because WebBank's regulators hold it responsible for that activity, even when it has sold a loan.

28. Through August 2016, WebBank originated loans through the Avant platform to Colorado residents. The Administrator's actions, however, disrupted the secondary investor market for loans originated to Colorado residents by threatening those investors' ability to realize the return on the loans they might purchase. Therefore, as a direct result of the Administrator's

actions, WebBank ceased originating loans to Colorado residents. As a result, WebBank has forgone the income that it would have earned on loans made to Colorado residents.

29. All of the credit agreements that WebBank utilizes for extending credit to Colorado residents expressly state that the borrower's agreement is with WebBank, that WebBank is the lender, that WebBank is located in Utah, that Utah law applies, and that WebBank is extending credit from Utah.

30. All of the loans that WebBank offers to Colorado residents are at interest rates that are permitted by Utah state law. Utah Code § 70C-2-101.

31. All of WebBank's loans to Colorado residents also comply with federal interest rate laws. The maximum rate of interest chargeable to active-duty service members and their dependents under federal law is 36%. *See* 10 U.S.C. 987(b); 32 C.F.R. § 232.4(b). The Consumer Financial Protection Bureau also uses 36% as a threshold to define high-interest loans, as loans above that rate would be subject to additional regulatory requirements in its proposed rule on consumer lending. *See* 12 C.F.R. § 1041.3(b)(3)(i) (published at 81 Fed. Reg. 47,863, 48,168 (July 22, 2016)). Federal regulators also do take enforcement action against banks that engage in predatory lending. *See, e.g.*, "FDIC Seeks in Excess of $200 Million Against Credit Card Company and Two Banks for Deceptive Credit Card Marketing," FDIC Press Release, June 10, 2008 (enforcement action against a bank and its third-party marketing and servicing partner for "inadequate credit card disclosures and predatory lending practices, particularly with some subprime products").[1]

[1] https://www.fdic.gov/news/news/press/2008/pr08047.html.

## II. FEDERAL LAW EMPOWERS WEBBANK TO MAKE AND SELL LOANS WITH BORROWERS IN ALL 50 STATES.

32. Federal law protects the powers of national banks and FDIC-insured state-chartered banks to make loans to borrowers nationwide and to sell those loans to non-banks on the same terms. It does so by preempting the application of state interest-rate laws to the banks' loans, and by incorporating certain common-law banking principles that have been settled in this nation since its early years.

### A. The Preemptive Scope Of Section 27 Of The FDIA Is The Same As The Preemptive Scope Of Sections 85 And 86 Of The NBA.

33. Congress adopted Section 27 of the FDIA, 12 U.S.C. § 1831d, to ensure that state-chartered banks could compete on equal terms with national banks in serving as a source of liquidity to the credit markets. The purpose of Section 27, as recited in the statute itself, is "to prevent discrimination against State-chartered insured depository institutions," as compared to national banks, in lending nationally in compliance with the interest-rate laws of the bank's home state. *Id.* § 1831d(a).

34. Because Congress's express purpose in enacting Section 27 was to prevent discrimination against state-chartered banks by placing them on an equal footing with national banks with respect to interest-rate regulation, the point of departure for assessing the scope of express preemption under Section 27 is the corresponding and longstanding protection afforded national banks under Sections 85 and 86 of the National Bank Act, 12 U.S.C. §§ 85, 86.

35. Section 85 establishes that federal law exclusively governs the interest rates that a national bank may charge its loan customers. Section 86 provides an exclusively federal cause of

action for unlawful interest rates, including late fees. Together, Sections 85 and 86 completely preempt state interest-rate laws other than those of a national bank's home state.

36. In particular, Section 85 permits an "association," *i.e.*, a national bank, to "charge on any loan interest at the rate allowed by the laws of the State, Territory, or District where the bank is located," or a rate one percent above the Federal Reserve discount rate, whichever is higher, "and no more." 12 U.S.C § 85.[2] Section 86, in turn, establishes an exclusively federal cause of action for alleged violations of Section 85, and specifies the penalties that apply, when the terms of a national bank's loan provide for interest greater than that allowed by Section 85.

37. Sections 85 and 86 not only set a maximum interest rate that a national bank may charge (which is the maximum rate allowed by its home State), but they preclude any other State from imposing a lower maximum interest rate on that bank. *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15, 318 (1978) (holding that Minnesota's lower limit on interest rates does not apply to a loan to a Minnesota borrower that is originated by a national bank located in Nebraska). "To the extent the enumerated federal rates of interest are greater than permissible state rates, state interest-rate laws must, of course, give way to the federal statute." *Id.* at 318 n.31; *see* 12 C.F.R. § 7.4001(b) (stating the same understanding).[3]

[2] The Office of the Comptroller of the Currency has defined the term "interest" by regulation, 12 C.F.R. § 7.4001(a), and the Supreme Court has held that courts must defer to that definition, *see Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741-42, 744-45 (1996). The FDIC has concluded that "interest" has a similar meaning under Section 27. FDIC General Counsel's Opinion #10, 63 Fed. Reg. 19,258 (April 17, 1998).

[3] Congress "can preempt state statutes either by an express statement of preemption or by implication." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011). "Express preemption arises from explicit preemption language in the statute." *Id.* If "[a] state law

38. Because Sections 85 and 86 supersede the operation of state interest-rate laws as to national banks, they completely preempt state law. "Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank"; any purported application of state interest-rate law to a national bank's loans is subject to "complete pre-emption." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8, 11 (2003). The same rule of preemption applies to state-law claims about other sorts of fees and loan arrangements that may violate state law. *See, e.g.*, *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741-42, 744-45 (1996).

39. As further set forth in Part I.C below, Section 27 of the FDIA provides precisely the same protection to state-chartered banks such as WebBank.

**B. Section 27 Of The FDIA And Section 85 Of The NBA Incorporate The "Valid-When-Made" Rule.**

40. A bank's power to charge the interest rate authorized by Section 85 also includes the power to sell, assign, or otherwise transfer a loan to a non-bank entity at the same interest rates and related terms to which the bank and the borrower agreed, without limitation by state interest-rate laws that might otherwise apply.

41. When Congress enacted Section 85's earliest statutory antecedent in 1864, *see* 13 Stat. 108, it was already well-established that a bank's power to sell loans was a "necessarily implied" corollary of the power to originate loans because, "in discounting notes and managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes." *Planters' Bank of Miss. v. Sharp*, 47 U.S. (6 How.) 301, 322-23 (1848) (holding that a state law

---

falls within the scope of [the] federal preemption provision," it must give way to federal law. *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010).

that barred a state bank from transferring a loan violates the constitutional prohibition on state impairment of contracts, U.S. Const. art. I, § 10, cl. 1); *see also id.* at 321-25. In adopting the NBA, Congress acted against the backdrop of, and preserved for national banks, this central aspect of a bank's lending power.[4]

42. Under the "valid-when-made" rule, if the interest-rate terms in a bank's original loan agreement were valid when made, then those terms remain valid after assignment, and the assignee may lawfully charge interest at the original rate.[5]

43. Last year, in a brief filed at the request of the United States Supreme Court and on behalf of the United States and the Office of the Comptroller of the Currency (which regulates national banks), the United States Solicitor General reaffirmed the federal government's unequivocal endorsement of the valid-when-made rule. The Solicitor General's brief stated that, "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." Br. *Amicus Curiae* of United States, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at *8 (U.S. May 24, 2016). The Solicitor General's brief thus concluded that, "[t]he power explicitly conferred on national banks by Section 85—*i.e.*, the power to originate loans at the maximum

---

[4] *See, e.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common law principle is well established … the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." (internal quotation and citations omitted)).

[5] *See Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833) (a "cardinal rule[] in the doctrine of usury" is that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction"); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828) ("[T]he rule cannot be doubted, that if the note be free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury.").

interest rate allowed by the national bank's home State—therefore carries with it the power to use the loans once originated for their usual commercial purposes, which include assignment of such loans to others." *Id.*

44. The Solicitor General went on to warn that "[a] national bank's federal right to charge interest up to the rate allowed by Section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate." *Id.*

45. The valid-when-made rule is more important to the banking system today than ever before, because banks increasingly depend upon their ability to sell the loans they originate. Before the advent of securitization, many banks were "portfolio lenders." They held most of the loans they originated, and funded those loans through deposits or other bank debt. Funding loans in this way, however, severely limited the banks' ability to respond to increases in the demand for credit. Portfolio lending also poses institutional risks to banks with portfolios that are not adequately diversified across geographic or other market sectors. Selling loans allows banks to limit the credit and interest-rate risks of holding a loan portfolio for many years, and to manage their exposure to loss as well as their compliance with their capital requirements.

46. In addition to reducing risk to banks, the ability of banks to sell loans to a secondary market benefits consumers and business borrowers as well. The ability to sell loans enables banks to originate more loans than they would if they were required to hold the loans they originated. The banks' ability readily to originate loans serves, in turn, to decrease rates.

47. The secondary loan market also lowers risks to the FDIC from bank failures. The secondary market transfers ownership risks of the loans away from federally insured banks to

private investors that are not FDIC-insured. This benefit, together with lower interest rates and greater availability of credit, improves the nation's economy.

48. As set forth below, the "valid-when-made" rule is also incorporated into Section 27 of the FDIA.

**C. Section 27 Of The FDIA Preempts The Enforcement Action.**

49. Section 27 of the FDIA provides state-chartered banks the same power that Section 85 and 86 of the NBA provide to national banks to lend nationwide in compliance with the interest-rate laws of their home state, and to sell loans under the valid-when-made rule.

1. *The FDIA Expressly Preempts the Application of State Law to Loans Issued by a State-Chartered Bank.*

50. To "prevent discrimination against state-chartered" banks, 12 U.S.C. § 1831d(a), Congress created Section 27 of the Federal Deposit Insurance Act to mirror Sections 85 and 86 in every material respect. *See Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014). As the *Sawyer* court held, "the same express preemption analysis governing Sections 85 and 86 of the National Bank Act applies to preemption of state usury laws under Section 27 of the FDIA and not only because the two provisions are 'virtually identical' in substance, policy, and internal logic—the same constitutionally prudential considerations direct the court's analysis of Section 27's preemption of the usury and late fee claims brought under [state] law . . . ." *Id.*

51. To understand why Congress put state-chartered banks on the same footing as national banks, it is important to understand the historical context within which Section 27 of the FDIA arose. Section 27 was added to the FDIA in 1980, as Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub. L. No. 96-221, 94 Stat. 132 (1980). The late 1970s brought soaring interest rates as a result of a credit crunch, and

state banks were particularly hampered in their ability to respond to the crisis, because of "state usury laws which often made loans economically unfeasible . . . ." *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826 (1st Cir. 1992). State banks were at a competitive disadvantage to national banks, because under Sections 85 and 86, national banks located in states that allowed higher interest rates were able, under Section 85, to export their home state's rates to borrowers in those states and to offer uniform terms to borrowers nationwide. To introduce new sources of credit and encourage lending by state-chartered banks, Congress enacted DIDA, which put state-chartered banks on an equal footing with national banks with respect state law regulation of interest rates. *See* 126 Cong. Rec. 6900 (Mar. 27, 1980) (statement of Sen. Proxmire, discussing purpose of Title V of DIDA, including Section 27). By expressly preempting state law and providing an exclusively federal cause of action for violating the federally imposed limit on interest rates, Section 27 mirrored Section 85 and 86, and promoted lending by state-chartered banks. *Id.* at 6907 (statement of Sen. Bumpers, discussing intent to promote state banks' lending).

52. Section 27 accordingly preempts "any State constitution or statute" that would otherwise apply to the "interest rates" that a state-chartered bank may charge, under the laws of its home state, on "any loan." The pertinent terms of Section 27 setting forth its express preemption and remedial scheme provisions are as follows:

> <u>Interest rates</u>. In order **to *prevent discrimination*** against State-chartered insured depository institutions . . . **with respect to interest rates** . . . **such State bank[s] . . . may**, **notwithstanding any** State constitution or statute **which is hereby *preempted*** for the purposes of this section . . . **charge on *any loan*** or . . . other evidence of debt . . . interest . . . at **the rate allowed** by the laws of the State, territory, or district where the bank is located . . . .

12 U.S.C. § 1831d(a) (emphases added).

> Interest Overcharge; Forfeiture; Interest Payment Recovery. … [T]he taking, receiving, reserving, or **charging a greater rate of interest than is allowed by subsection (a)**, when knowingly done, shall be **deemed a forfeiture** of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, **the person who paid it may recover in a civil action** commenced in a court of appropriate jurisdiction not later than two years after the date of such payment, an amount equal to twice the amount of the interest paid from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.

12 U.S.C. § 1831d(b) (emphases added).[6] Thus, the interest rates on loans originated by state chartered banks such as WebBank are governed exclusively by federal law.

53. The impact of Section 27 on state law is substantial. Many states have interest-rate laws that set limits on the interest rates that lenders may charge to borrowers in that state. For example, Colorado's interest-rate limit is 21 percent. Some states have set a lower limit. *See, e.g.*, Ark. Const. Amend. 89, § 3 (17 percent in Arkansas); N.C. Gen. Stat. § 53-173 (18 percent in North Carolina); Vt. Stat., tit. 9, § 41a(b)(5) (18 percent in Vermont). Others states have set a higher limit. *See* Md. Commercial Law § 12-1003(a) (24 percent in Maryland); N.Y. Banking Law § 351(1) & N.Y. Penal Law § 190.40 (25 percent in New York). Some states, such as California, South Dakota, and Utah, set no numerical limit at all. *See* Cal. Financial Code

---

[6] *See also Greenwood Trust Co. v. Hunter*, 517 U.S. 1241 (1996) (grant, vacate, and remand order in light of *Smiley*, to consider whether *Smiley*'s interpretation of "interest" to include other loan fees well applies to Section 27); *Sherman v. Greenwood Trust Co.*, 679 A.2d 652 (N.J. 1996) (applying *Smiley* and holding that Section 27 allowed exportation of late fees and preempts the interest-rate limits that New Jersey law imposes); *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133 (Colo. 1995) (Section 27, like Section 85, preempts state law limitations on loan fees as well as periodic interest charges).

§§ 22250, 22303 & 22304; S.D. Cod. Laws § 54-3-1.1; Utah Code § 70C-2-101.[7] Interest-rate limits also can change over time; they are typically set by statute and change whenever a legislature amends that statute. Given the variation in state interest-rate limits, loans that comply with the interest-rate limits in many states will nonetheless violate the interest-rate limits in many others. The preemption of state interest-rate laws that Section 27 provides is essential, as a practical matter, to allow state-chartered banks to lend on uniform terms nationwide.

2. *Congress Also Has Established an Extensive Framework of Federal Banking Regulation with Which State-Chartered, Federally Insured Banks Must Comply.*

54. In conjunction with the FDIA's express preemption provisions, Congress ensured that state-chartered banks, their loan programs, and their partners would be subject to substantial federal regulation in addition to the regulation that the individual State in which the bank is chartered would provide. "The legal framework governing the U.S. banking industry consists of a multitude of statutory provisions implemented by an army of regulators issuing myriad rules and regulations at the federal and state levels." Melanie L. Fein, *Banking and Financial Services: Banking, Securities, and Insurance Regulatory Guide*, Vol I. § 3.01, at 3-5 (2006). The FDIA's extensive regulation of FDIC-insured state-chartered banks and the loan programs that they administer is designed to protect against bank failures that cause financial loss to the government insurance fund and, more broadly, to ensure public confidence in our banking system.[8]

[7] All of these examples assume a $15,000 installment loan made by a lender licensed in that state; many states laws impose different limits based on the size of the loan and whether the lender is licensed.

[8] FDIC Risk Management Manual § 1.1, available at www.fdic.gov/regulations/safety/manual/index.html.

55. The FDIC is the primary federal regulator of state-chartered federally insured banks and their partners and affiliates, and is charged with comprehensively reviewing both the banks' business operations and compliance with applicable legal requirements. *Banking and Financial Services* § 3.03, at 3-6. Federally insured banks are periodically examined by the FDIC, typically at least once every 12 months. 12 U.S.C. § 1820(b), (d); 12 C.F.R. § 337.12(a)-(c).[9] FDIC examiners, who possess "thorough knowledge of Federal *and* State laws and regulations pertinent to the bank being examined" (FDIC Risk Management Manual § 4.5, emphasis added), evaluate not only "[c]ompliance with laws and regulations," but also the "adequacy of audits and internal controls to . . . ensure compliance with laws, regulations, and internal policies" (*id*. at § 1.1). The FDIC mandates that a state-chartered bank grant examiners "access to all records and employees of the bank" to facilitate examinations. *Id.* The FDIC states that periodic examinations are "the best means of determining the bank's adherence to laws and regulations." FDIC Risk Management Manual § 1.1.[10]

56. Federal banking law specifically contemplates that federally insured banks will enter into relationships with third parties to provide services in connection with their lending programs. Congress has endorsed such relationships by granting the FDIC the power to examine both the banks *and* the third parties who provide such services. 12 U.S.C. § 1867(c).

---

[9] Utah-chartered banks, such as WebBank, are also supervised by the Utah Department of Financial Institutions. *See* Utah Code § 7-1-314.

[10] In addition to the Risk Management Manual, which provides general guidance on examinations, the FDIC has issued a Compliance Examination Manual focused on the part of examinations that address a bank's compliance with applicable laws. *See* www.fdic.gov/regulations/compliance/manual/index_pdf.html.

Section 1867, which is part of the Bank Service Company Act, is entitled "Services performed by contract or otherwise" and provides, in pertinent part, that

> whenever a depository institution that is regularly examined by an appropriate Federal banking agency, or any subsidiary or affiliate of such a depository institution that is subject to examination by that agency, **causes to be performed for itself, by contract or otherwise,** any services authorized under this chapter, whether on or off its premises—
>
> (1) such performance shall be subject to regulation and examination by such agency **to the same extent as if such services were being performed by the depository institution itself on its own premises**, and
>
> (2) the depository institution shall notify each such agency of the existence of the service relationship within thirty days after the making of such service contract or the performance of the service, whichever occurs first.

12 U.S.C. § 1867(c) (emphases added).[11]

57. Congress thus has recognized both that (a) a bank may arrange "by contract or otherwise" for a third party to perform loan program services and (b) if the bank does so, both the bank and the third party are subject to FDIC's regulatory and supervisory authority to the same extent as if all of the services were performed by the bank itself. *Id.*

58. The FDIC further recognizes that, in some lending programs, banks will rely substantially on services provided by third parties, including third parties who also purchase loan receivables: "The third party generally solicits prospective credit card customers and then provides approved applicants with a credit card. The bank is identified as the issuer of the card while the . . . partner, and other sub-contracted participants may not necessarily be apparent to

[11] An FDIC-insured state-chartered bank such as WebBank is a "depository institution . . . regularly examined by an appropriate Federal banking agency . . . ." *Id.*; 12 U.S.C. § 1813(a)(1)-(2), (c) (defining "depository institution" to include any national or state bank).

the cardholder. . . . [T]he receivables are usually held by the . . . partner . . . or another party." FDIC Credit Card Activities Manual, Ch. XIV. The FDIC explains that "[w]hile the bank sheds itself of a majority of the day-to-day operational duties associated with operating the program in most cases, **it always retains ultimate responsibility for the program based on . . . it being the issuer of record**." *Id.* (emphasis added).

59. The FDIC has issued guidance requiring banks such as WebBank to manage appropriately their relationships with third parties—all of which are themselves subject to FDIC oversight. *See* Guidance for Managing Third-Party Risk, FIL-08-044 (June 6, 2008).[12] Under that guidance, "the FDIC evaluates activities conducted through third-party relationships as though the activities were performed by the institution itself." *Id.*

60. The FDIC has also recognized the value of bank programs such as WebBank's marketplace lending program with Avant. *See* "Marketplace Lending," FDIC Supervisory Insights (Winter 2015).[13] "Marketplace lending" refers to online lending platforms that facilitate loans to consumers and small businesses, where investors—either retail investors or institutional investors—agree to acquire the loans after origination and take the risk/reward that the loan will be repaid. The FDIC explained:

> Some marketplace lending companies operate . . . by working through a cooperative arrangement with a partner bank. In these cases, the bank-affiliated marketplace company collects borrower applications, assigns the credit grade, and solicits investor interest. However, from that point the bank-affiliated marketplace company refers the completed loan application packages to the partner bank that makes the loan to the borrower. The partner bank typically

[12] Available at https://www.fdic.gov/news/news/financial/2008/fil08044.html.

[13] Available at https://www.fdic.gov/regulations/examinations/supervisory/insights/siwin15/SI_Winter2015.pdf.

> holds the loan on its books for 2-3 days before selling it to the bank-affiliated marketplace company. Once the bank-affiliated marketplace company purchases the loan from the partner bank, it issues security notes up to the purchase amount to its retail investors who pledged to fund the loan. By the end of the sequence of transactions, the borrower's repayment obligation transfers to the bank-affiliated marketplace company, and the security noteholder maintains an unsecured creditor status to the bank-affiliated marketplace company . . . (see Figure 2 on the previous page). In certain circumstances, some institutional investors may invest in whole loan transactions, which are often arranged directly between the interested parties and outside any cooperative arrangement with a partner bank.
>
> Once the process is complete, borrowers begin making fixed monthly payments to the bank-affiliated marketplace company which issues a pro rata payment to the investor, less loan servicing fees.

"Marketplace Lending," FDIC Supervisory Insights (Winter 2015).

61. The FDIC concluded that participating in such arrangements could be beneficial to banks—providing "an attractive source of revenue"—as long as banks adequately addressed the risks presented. *Id.* at 18 (requiring banks to have "proper risk identification, appropriate risk-management practices, and effective oversight" of their programs).

62. Within the past year, the FDIC also has proposed targeted examination guidance for "third-party lending." *See* Proposed Examination Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016).[14] The FDIC defined "third-party lending" as an arrangement between the bank and another party where the other party performs "a significant aspect of the lending process, such as some or all of the following: marketing; borrower solicitation; credit underwriting; loan pricing; loan origination; retail installment sales contract issuance; customer service; consumer disclosures; regulatory compliance; loan servicing; debt collection; and data

[14] Available at https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf.

collection, aggregation, or reporting." The FDIC explained that, in some arrangements, the bank does not retain the loans, "but rather holds the loan for only a short period of time before selling it to the third party . . . ." These arrangements use "the institutions' ability to export interest rates." Again, the FDIC recognized the potential benefits to both borrowers and banks because these "arrangements may . . . enable institutions to lower costs of delivering credit products and to achieve strategic or profitability goals." And the FDIC expects banks lenders to have oversight of the servicing of the loans they originate through these programs, even after the loans are sold.

63. The FDIC therefore directs examiners to "evaluate all applicable activities conducted through third-party relationships as though the activities were performed by the institution itself," concluding that third-party relationships "do not insulate the institution from its ultimate responsibility to conduct banking activities in a safe and sound manner and in compliance with applicable consumer protection laws . . . ." Compliance Manual, § VII-5.7. Thus, the FDIC regulates a bank's loan program (and not merely the bank) where the bank is the "issuer of record," as if the bank offered the program without the involvement of a third party service provider or purchaser of the loans. The FDIC will "conduct targeted examinations of significant third-party lending arrangements . . . ." Proposed Guidance for Third-Party Lending. These reviews can encompass the full scope of FDIC oversight, including: "corporate governance; financial strength; compliance management system; credit underwriting and administration; model risk management; vendor management; internal controls; audit program; BSA/AML; safeguarding of customer information, information technology; consumer complaints; and litigation."

64. WebBank is examined at least annually by the FDIC and the Utah Department of Financial Institutions, each of which reviews all of WebBank's lending programs, because WebBank is the issuer of credit.

**D. Section 27 Completely Preempts The Administrator's Enforcement Action.**

65. Given Section 27's express non-discrimination objective and language mirroring Sections 85 and 86, Section 27 necessarily incorporates the valid-when-made rule and completely preempts causes of action based on state interest-rate laws. The preemptive scope of Section 27 protects the powers of a state-chartered bank both to originate loans that are valid under the interest-rate laws of its home state and to sell those loans on those same terms. By enforcing Colorado's Interest Rate Laws against Avant, the Administrator is effectively denying WebBank the power to sell its loans to Colorado residents on the valid terms on which they were made. The Enforcement Action is completely preempted by Section 27.

66. Anticipating a preemption challenge, the Enforcement Action alleges that WebBank is not the true lender of the loans at issue. *See* Am. Compl. ¶¶ 32-33.

67. The FDIA, however, expressly preempts the application of a borrower's state interest-rate law—in this instance, Colorado's Interest Rate Laws—to "any loan" issued by a state-chartered bank. *See* 12 U.S.C. § 1831d(a).

68. Thus, as the District Court for the District of Utah explained in a recent case involving a similar attempt to impose state law restrictions on WebBank's loans that had been sold to a partner, the preemption analysis is the same no matter how "insignificant" a role the state-chartered bank may play after originating the loans. *See Sawyer*, 23 F. Supp. 3d at 1367 (quotation omitted). *Sawyer* rejected arguments that the FDIA's preemptive force did not apply

to allegations about "a lending program of a non-bank attempting to circumvent [state] usury laws," and held that the only relevant inquiry in the preemption analysis involved "look[ing] to the originating entity (the bank) in the arrangement, and not the ongoing assignee." *Id.* (construing *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000)).

69. The court in *Sawyer* also explained that its construction of Section 27 was reinforced by Section 1867(c). The court noted that, when a "depository institution" like WebBank contracts with a third-party service provider like Avant to buy and service loans, "such performance shall be subject to regulation and examination by such agency **to the same extent as if such services were being performed by the depository institution itself on its own premises**." *Sawyer*, 23 F. Supp. 3d at 1368 (quoting 12 U.S.C. § 1867(c)(1)) (emphasis added). "Based on this provision, therefore, loans serviced through contracts with third parties such as [Avant] are included within the definition of 'any loan' under Section 27 of the FDIA and are therefore expressly preempted by the federal statute." *Id.*

70. To the extent a state-chartered bank's ability to originate and promptly transfer loans leads to "concerns about protection of state usury laws," the *Sawyer* court explained, such concerns "present questions of legislative policy better addressed by Congress," or through "appeal to federal banking regulators concerned about the 'rental' of national bank charters." *Id.*

71. The Enforcement Action also alleges, based on the Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), that the sale of a loan extinguishes any interest the bank may have in the validity of its terms. *See* Am. Compl. ¶ 31 (citing *Madden*, 786 F.3d at 250). But, as the United States Solicitor General observed, the parties in *Madden* "did not cite Section 85 even once" in their briefing to the Second Circuit, let

alone discuss the valid-when-made rule. Br. *Amicus Curiae* of United States, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at *18-19 (U.S. May 24, 2016) ("The court of appeals' failure to recognize the full scope of powers granted to national banks under Sections 85 and 24(Seventh), and the court's failure to appreciate the potential significance of the valid-when-made rule, may be attributable at least in part to the lack of clarity in the briefing."). The *Madden* decision thus does not resolve the preemption issues raised here.

## III. THE ADMINISTRATOR'S ENFORCEMENT ACTION DIRECTLY COMPROMISES WEBBANK'S FEDERALLY PROTECTED POWER TO ORIGINATE AND TRANSFER LOANS.

72. Avant of Colorado, LLC, holds a license to serve as a supervised lender in Colorado. Although Avant of Colorado, LLC, does not make loans in Colorado, it holds this license because Colorado requires such a license not only to lend (*i.e.*, make loans), but also to acquire and service loans. *See* C.R.S. § 5-2-301. Avant acquires and services the loans to Colorado borrowers that WebBank originates.

73. The Administrator, following a routine examination of Avant of Colorado, LLC, cited Avant of Colorado, LLC, for violation of Colorado loan regulations in a report of examination issued in January 2016. Avant responded, disputing the applicability of Colorado law to the loans that were originated by WebBank. On April 14, 2016 and July 29, 2016, the Administrator issued letters taking the position that Colorado law applied. Avant disputed this contention in responses to the Administrator, and representatives of both Avant and WebBank met with the Administrator and representatives of the Attorney General's Office in September 2016 in an attempt to resolve the matter.

74. On January 27, 2017, the Administrator filed the Enforcement Action, *Meade v. Avant of Colorado LLC* (Case No. 2017cv30377) in Denver District Court, naming both Avant entities as defendants. Despite having met with WebBank, the Administrator failed in the initial complaint even to mention WebBank or its central role in originating all of the loans at issue. The Administrator subsequently amended the complaint, however, to acknowledge and add a number of allegations regarding WebBank's involvement in issuing and holding the loans, and in selling them to Avant. Avant subsequently removed the Enforcement Action to this Court, with case number 1:17-cv-00620-WJM-STV.

75. The Administrator asserts two claims for relief under Colorado's Interest Rate Laws against Avant. First, the Administrator alleges that Avant "ha[s] charged, assessed, collected, or received finance charges and delinquency charges" in connection with the loans originated by WebBank and that those charges "exceed the finance charges authorized and allowable under [C.R.S.] § 5-2-201" and the delinquency charges "authorized and allowable under [C.R.S.] § 5-2-203." Am. Compl. ¶ 43. Second, the Administrator alleges that the loans originated by WebBank using Avant's online platform "purport to provide that the law of a state other than Colorado applies, in violation of [C.R.S.] § 5-1-201(8)." *Id.* ¶ 45.

76. The Administrator does not allege that any consumers are suffering harm or that WebBank or Avant or any of its other affiliates and programs are engaged in predatory lending. To the contrary, while it is undisputed that the loans at issue modestly exceed the rates that would be permitted by Colorado law if that law applied, all parties agree that the loans comply with the laws of Utah and that WebBank and its programs have complied with applicable FDIC and Utah regulations. The only issue to be resolved in the Enforcement Action is whether the

Administrator may enforce Colorado's Interest Rate Laws on loans that WebBank originated and sold to Avant.

77. The Administrator has also brought another lawsuit raising similar claims against Marlette Funding LLC ("Marlette"), for loans it purchased from Cross River Bank, a New Jersey-chartered bank. That case was also filed in Denver District Court and also has been removed to this Court. *See Colorado ex rel. Meade v. Marlette Funding, LLC*, Case No. 1:17-cv-00575-PAB-MJW (D. Colo.). As with the Avant complaint, the Administrator's amended complaint against Marlette acknowledges the role of Cross River Bank, also a state-chartered bank, in originating the loans at issue, but seeks relief only against the entity that acquired and services the loans.

78. Under the view of the law advanced in the Enforcement Action, the decision whether WebBank is properly deemed to have originated the loans at issue is to be decided as a matter of state law, rather than as a matter of federal law under the plain language of Section 27. Furthermore, even accepting that WebBank originated the loans to Colorado residents, and even accepting that the loans are valid when made, the Administrator's view in the Enforcement Action is that the loans become unenforceable and uncollectable at the contracted terms the moment they are sold to a non-bank entity such as Avant. The Administrator's view of the law effectively means that WebBank cannot sell the loans it makes to Colorado borrowers on the terms on which WebBank has made the loans, unless it conforms the terms to Colorado law. Were the Administrator's view of the law correct, state-chartered banks could not engage in nationwide lending at uniform rates, because state-law interest-rate limits vary from state to state and are subject to change at any time.

79. If the Enforcement Action is not enjoined, WebBank will suffer harm in at least the following ways:

80. *First*, as discussed above, the Administrator directly challenges WebBank's lending program, and WebBank is not institutionally suited to perform all of the functions that Avant currently performs for loans that WebBank makes to Colorado residents. The Enforcement Action threatens to prohibit Avant from purchasing WebBank's loans to Colorado residents, and to preclude WebBank from partnering with Avant in lending to Colorado residents, and has caused and will cause WebBank to suffer a financial loss as a result.

81. *Second*, WebBank today shares in the upside of performing loans after it sells the loans to Avant. The Enforcement Action threatens to invalidate or otherwise impair those loans, and, thus, to deprive WebBank of its future income from these loans.

82. *Third*, WebBank is able to sell its loans made to Colorado residents and residents of other states at the contracted prices based upon the assumption that the terms of the loans it sells will remain valid after the sale. The Enforcement Action is impairing and will continue to impair the value of WebBank's loans in Colorado and nationwide if it is not enjoined.

83. *Fourth*, the Administrator will likely bring claims similar to those set forth in the Enforcement Action against other marketing and servicing partners with which WebBank does business. It is not practical for WebBank regularly to intervene in enforcement actions brought against its partners for non-compliance with individual state interest-rate limits. In light of Supreme Court precedents such as *Beneficial Bank*, 539 U.S. at 1, and the clear express preemption provision of Section 27 of the FDIA, WebBank should be able to rely on federal law

and its unambiguous preemption of state interest-rate law to lend to borrowers nationwide at interest rates permitted by its home state, just as national banks may do.

**CLAIM FOR RELIEF**

84. WebBank realleges and incorporates herein by reference paragraphs 1-83.

85. WebBank seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 65(d) of the Federal Rules of Civil Procedure.

86. The Supremacy Clause of the United States Constitution provides that federal law is the "supreme Law of the Land," and therefore it preempts state and local laws that interfere with or are contrary to federal law. U.S. Const. art. IV, cl. 2.

87. Section 27 provides in pertinent part that "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section . . . charge on any loan or . . . other evidence of debt . . . interest . . . at the rate allowed by the laws of the State, territory, or district where the bank is located." 12 U.S.C. § 1831d(a).

88. Section 27 further provides an exclusive remedy for any person aggrieved by the interest rates charged by a state-chartered bank. 12 U.S.C. § 1831d(b).

89. Federal law also provides that, when a "depository institution" like WebBank contracts with a third-party service provider like Avant to buy and service loans, "such performance shall be subject to regulation and examination by such agency to the same extent as if such services were being performed by the depository institution itself on its own premises." 12 U.S.C. § 1867(c)(1).

90. Because Section 27 preempts the application of state law to any loan issued by state-chartered banks, no matter whether the banks choose to hold the loans or to sell, to transfer,

or to securitize them; because the valid-when-made rule applies as a matter of federal law to loans issued and sold by state-chartered banks; and because § 1867 treats third-party service providers like Avant in the same manner "as if such services were being performed by the depository institution itself," the Enforcement Action is preempted, and Colorado's Interest Rate Laws may not be applied to loans originated by WebBank.

91. An actual, present and justiciable controversy has arisen between WebBank and the Administrator concerning whether the application of Colorado's Interest Rate Laws to loans that WebBank originates to Colorado residents is preempted by federal law.

92. Because the Administrator has enforced, currently is enforcing, and will continue to enforce Colorado's Interest Rate Laws in a manner that is preempted by federal law, and has persisted with pursuing its Enforcement Action against WebBank's marketing and servicing partner, Avant, Plaintiff is entitled to a declaratory judgment establishing that neither it nor its loans, nor any entity to whom WebBank has sold or assigned its loans, are subject to Colorado's Interest Rate Laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment against the Administrator, and respectfully prays that the Court:

93. Issue a judgment declaring that Colorado's Interest Rate Laws are expressly preempted by Section 27 of the Federal Deposit Insurance Act as to loans originated by WebBank, a state-chartered, FDIC-insured bank;

94. Permanently enjoin the Administrator from enforcing or otherwise applying Colorado's Interest Rate Laws against WebBank, any loans originated by WebBank, or any

assignee, partner, program, and/or servicer with respect to their involvement with any loans originated by WebBank, including any such loans that WebBank has sold or assigned to any third party; and

95. Issue such other relief as the Court may deem just and appropriate.

Dated: March 28, 2017

KAPLAN RICE LLP

Howard J. Kaplan
Joseph A. Matteo
142 West 57th Street, Suite 4A
New York, NY 10019
Telephone: (212) 333-0219
Facsimile: (212) 235-0301
Email: hkaplan@kaplanrice.com
jmatteo@kaplanrice.com

GORDON & REES LLP

*s/ Joshua G. Urquhart*
Joshua G. Urquhart
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Telephone: (303) 534-5160
Facsimile: (303) 534-5161
Email: jurquhart@gordonrees.com

SIDLEY AUSTIN LLP

*s/ Mark E. Haddad*
Mark E. Haddad
Collin P. Wedel
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: mhaddad@sidley.com
cwedel@sidley.com

***Attorneys for Plaintiff WebBank***