**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00786-PAB-CBS

WEBBANK,

     Plaintiff,

v.

JULIE ANN MEADE, in her official capacity as Administrator of the
Uniform Consumer Credit Code for the State of Colorado,

     Defendant.

---

**DEFENDANT'S 12(b)(1) and (6) MOTION TO DISMISS
WEBBANK'S COMPLAINT [DKT. #1]**

---

     Defendant Julie Ann Meade ("Administrator") filed a civil enforcement action

("Enforcement Action") in Denver District Court against Avant, Inc. (and its subsidiary), relating

to loans made to Colorado consumers. (**Ex. A**.)[1] The Administrator alleges that Avant and

WebBank, a Utah state-chartered bank, have entered into an arrangement whereby Avant

purports to use WebBank's right under federal law to "export" the interest rate of WebBank's

home state when lending in Colorado in order to exceed Colorado's state interest rate caps. (*Id.*

at ¶ 27.) However, Avant is the true lender of the loans—performing the tasks fundamental to the

business of lending and holding the predominant economic interest in the loans. (*Id.* at ¶¶ 32-35.)

WebBank receives a small share of the profit (approximately 1%) for its nominal role in the

---

[1] In resolving a motion to dismiss, the Court may consider documents referenced in the
complaint or that otherwise inform the basis of the plaintiff's claim and may take judicial notice
of facts which are a matter of public record. *Wolfe v. AspenBio Pharma, Inc.*, 2012 U.S. Dist.
LEXIS 130490, *7 (D. Colo. Sept. 13, 2012).

arrangement. (*Id.* at 34.)

The Enforcement Action against Avant—not WebBank—asserts only state-law claims. Avant removed the case to this Court (No. 1:17-cv-00620-WJM-STV), claiming federal preemption as the basis for jurisdiction. The Administrator's motion to remand is pending.

In the meantime, WebBank filed this suit, seeking to address the federal preemption issues already being litigated in the Enforcement Action. WebBank's claim, which seeks only declaratory and injunctive relief, should be dismissed because:

1. this Court lacks subject matter jurisdiction over WebBank's claim under the well-pleaded complaint rule;
2. the alleged injury belongs to Avant, and WebBank thus lacks standing;
3. WebBank's suit fails as a matter of law because the subject preemption rights cannot be enforced by non-banks; and
4. pursuant to *Younger* abstention, Cross River's complaint should be dismissed if the Administrator's pending motion to remand the Enforcement Action is granted.

**ARGUMENT**

**I.    The Court lacks subject matter jurisdiction under the well-pleaded complaint rule because WebBank seeks only to establish a defense**

WebBank asserts that this Court has subject matter jurisdiction over its claims pursuant to 28 U.S.C. § 1331 and §§ 2201-2202. (Dkt. #1, at ¶ 14.) As the plaintiff, WebBank bears the burden of establishing the Court's subject matter jurisdiction. *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008). Applying the well-pleaded complaint rule, however, this Court lacks subject matter jurisdiction over WebBank's claim.

The well-pleaded complaint rule provides that a federal preemption defense does not, by itself, give rise to federal question jurisdiction. *See Ben. Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003) ("a defense that relies on … the pre-emptive effect of a federal statute … will not provide

a basis for removal") (citation omitted). When a party seeks to declare that a state law is preempted, the suit effectively reverses the position of plaintiff and defendant—stating an affirmative defense in the form of a complaint. Under those circumstances, the well-pleaded complaint rule nevertheless applies. "Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction…." *See Madsen v. Prudential Fed. S&L Ass'n*, 635 F.2d 797, 803 (10th Cir. 1980) (citation omitted).

Here, WebBank seeks a declaration, based on the Administrator's Enforcement Action against Avant, that Colorado law is preempted by federal banking law. (Dkt. #1, at ¶¶ 74, 85-92.) The character of the state-court action determines whether there is federal question jurisdiction, and the Administrator asserts only state-law claims in that action. Accordingly, under the well-pleaded complaint rule, the Court lacks subject matter jurisdiction over WebBank's suit.

An exception to the well-pleaded complaint rule exists but is inapplicable here. The Supreme Court has held that state usury claims asserted directly against a *national* bank are "completely preempted" notwithstanding the well-pleaded complaint rule. *Anderson*, 539 U.S. at 11. WebBank, however, is a state bank. The Supreme Court has never applied the complete preemption doctrine to usury claims against state-chartered banks.

The Eighth Circuit has held that usury claims against state banks are *not* completely preempted, examining the textual differences between the two applicable federal interest exportation statutes in support of its conclusion. *Thomas v. US Bank Nat'l Ass'n*, 575 F.3d 794, 799-800 (8th Cir. 2009) (rejecting contrary holdings of the Third and Fourth Circuits which did

not examine the textual differences). As a state bank, complete preemption therefore does not

apply, and WebBank's claims should be dismissed for lack of subject matter jurisdiction.

**II.     WebBank lacks standing because the Enforcement Action seeks relief only from Avant; the alleged WebBank injury is too attenuated**

Throughout its complaint, WebBank alleges that it has standing because it has suffered

harm as a result of the Enforcement Action. (Dkt. #1, at ¶¶ 10, 11, 12, 28, 78, 80–83.) However,

the Enforcement Action seeks no relief against WebBank. (Ex. A, at ¶¶ 42-45.) Aside from

WebBank's conclusory allegations, which cannot give rise to standing, the alleged injuries

identified by WebBank belong to Avant or are too attenuated to constitute standing.

A federal plaintiff must establish standing by alleging "personal injury fairly traceable to

the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

*Qwest Corp. v. PUC of Colo.*, 479 F.3d 1184, 1191 (10th Cir. 2007). WebBank acknowledges

that the Enforcement Action is against Avant alone, but contends that it "cannot leave its dispute

with the Administrator to be resolved only in [that] context" because "the impact of that action is

not limited to Avant." (Dkt. #1, at ¶ 10.) However, such conclusory allegations do not give rise

to standing. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

WebBank also alleges that since August 1, 2016, it has retained "an economic interest" in

loans originated through the "Avant platform" because it is "entitled to a portion of the borrower

payments." (Dkt. #1, at ¶ 27.) However, the Enforcement Action does not seek to prevent

*WebBank* from collecting borrower payments, but WebBank claims that it has been indirectly

injured by the suit's impact on Avant and the "secondary investor market." (*Id*. ¶ 28.) Another

district court has rejected this exact argument—that a bank's allegations of indirect harm gave

rise to standing. *Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711 (E.D. N.C. 2002).

In *Lingerfelt*, a state attorney general sued a non-bank payday lender, alleging that the non-bank was liable under state usury law for charges that it made on loans that purported to be originated by a national bank. *Id*. at 713-14. After the non-bank unsuccessfully attempted to remove the attorney general's state claims to federal court, the bank sued the attorney general in a separate action in federal court and sought a declaration that the payday lender, which acted as the bank's "agent in promoting, originating, and servicing [the bank's loans]," was not subject to state usury laws because of the bank's interest exportation rights. *Id*. at 714 & n.4.

In dismissing the bank's claim for lack of standing, the court reasoned that the attorney general asserted only state-law claims against the non-bank, that the attorney general had alleged the bank was not the true lender, and that the indirect effect on the bank was not enough to give it standing. *Id*. WebBank's complaint raises nearly identical claims, seeking a declaration that the Enforcement Action against Avant is preempted because of WebBank's role in originating the subject loans. Like *Lingerfelt*, WebBank's allegations are insufficient to give it standing.

Finally, WebBank contends that it ceased making Avant loans in Colorado in August 2016, another alleged injury. (Dkt. #1, at ¶ 28.) However, that injury is self-inflicted because the Enforcement Action does not seek to enjoin WebBank from lending. Self-inflicted injuries do not give rise to standing. *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (citations omitted) ("self-inflicted" harm does not satisfy the standing requirement because it is not a "cognizable injury" under Article III); *Pierce v. Green Tree Servicing*, 2015 U.S. Dist. LEXIS 148809, 5-6 (D. Colo. Nov. 3, 2015) (same). Accordingly, WebBank's complaint should be dismissed for lack of standing.

**III.    WebBank's complaint fails to state a claim under Rule 12(b)(6) because interest exportation does not preempt the application of state usury laws to non-banks as a matter of law**

WebBank's claim should also be dismissed under Rule 12(b)(6) because, as a matter of law, it is not entitled to the declaration it seeks. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted). WebBank contends that its interest exportation right "preempts the application of state law" with respect to loans that WebBank sells to third parties such as Avant. (*Id*. at ¶ 90.) But, as explained below, that right cannot be assigned to non-banks as a matter of law.[2]

A.    Interest exportation is created by federal statute

Interest exportation originates from the National Bank Act, passed in 1864. Under the NBA, banks may charge "interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85. When a state's usury laws are more restrictive than the laws of a national bank's home state, "state usury laws must … give way to the federal statute." *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 319 (1978).

The NBA's exportation provision does not apply to state-chartered banks; however, Congress extended interest exportation rights to FDIC-insured state banks by enacting Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA").[3]

---

[2] Pursuant to this Court's 12(b)(6) practice standards, the Administrator does not contend that Cross River failed to plead a necessary element of its claim; rather, the Administrator contends Cross River is not entitled to the relief it seeks as a matter of law.

[3] Section 521 of DIDA was codified by adding Section 27 to the Federal Deposit Insurance Act (12 U.S.C. § 1831d).

*Greenwood Trust Co. v. Mass.*, 971 F.2d 818, 826 (1st Cir. 1992) (citing 12 U.S.C. § 1831d(a)).

      B.    <u>Only banks can export interest; the right cannot be enforced by bank subsidiaries,</u>
<u>affiliates, or agents, and cannot be assigned</u>

WebBank asserts that federal law preempts Colorado's ability to enforce its usury laws against Avant. (Dkt. #1, at ¶¶ 65, 90.) When courts determine whether federal statutes preempt state law, the "ultimate touchstone" is the intent of Congress. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Thus, the inquiry here is whether Congress, when enacting the interest exportation provisions of the NBA and DIDA, intended to preempt state laws that would otherwise apply to non-banks.

If Congress has not explicitly stated that a statute is intended to preempt a specific area of state law, a court can find that a state law is preempted only if the statute's "structure and purpose" reveal an implicit Congressional intent to preempt. *Nelson*, 517 U.S. at 30-31. This occurs where Congress has created a pervasive regulatory scheme (field preemption) or if a state law prevents or significantly interferes with federal law (conflict preemption). *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

Federal banking laws do not preempt the entire field of regulation. *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 30 (1996). Instead, a conflict preemption analysis applies. 12 U.S.C. § 25b(b) (adopting the *Nelson* preemption standard and confirming that the NBA "does not occupy the field in any area of State law"); *Bankwest, Inc. v. Baker*, 411 F.3d 1289, 1302 (11th Cir. 2005) (applying conflict preemption to state bank loans), *vacated as moot* 446 F.3d 1358 (11th Cir. 2006).

Congress could have provided in the NBA and DIDA that the banks' interest exportation rights preempt state laws as applied to non-banks. However, neither statute includes any such

express provision, stating instead that interest exportation rights belong to banks. *See* 12 U.S.C. § 1831d(a); 12 U.S.C. § 85.

Legislation was introduced into Congress last year that would have amended the NBA and DIDA to extend exportation rights to non-banks. House Bill 5724 sought to amend both statutes to provide that "[a] loan that is valid when made as to its maximum rate of interest in accordance with this section shall remain valid with respect to such rate regardless of whether the loan is subsequently sold, assigned, or otherwise transferred to a third party." H.R. 5724, 114th Cong. (2016) (**Ex. B**). However, House Bill 5724 was never enacted.

In 2007, the Supreme Court held that the NBA interest exportation provision applied to operating subsidiaries and other non-bank "affiliates" of national banks. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 19-21 (2007) ("The NBA is thus properly read … to protect from state hindrance a national bank's engagement in the 'business of banking' whether conducted by the bank itself or by an operating subsidiary…."). But in 2010 Congress overturned *Watters* by enacting the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-203. Dodd-Frank amended the NBA to clarify that the NBA's preemptive scope specifically does *not* extend to subsidiaries, affiliates, or agents of national banks. 12 U.S.C. § 25b(h). *See Gordon v. Kohl's Dept. Stores.*, 172 F. Supp. 3d 840, 863-64 (E.D. Pa. 2016) (noting that Dodd-Frank "effectively overturned" *Watters* and citing 12 U.S.C. § 25b(h) in finding that state-law claims against store that serviced national bank's loans were not preempted).

Given that state usury claims against bank subsidiaries, affiliates, and agents are not preempted, such claims certainly are not preempted when asserted against third parties who purchase bank loans. Third-party purchasers act on their own behalf and have an even more

remote claim to a bank's interest exportation rights than bank subsidiaries or agents. *E.g.,*

*Pennsylvania v. Think Fin., Inc.*, 2016 U.S. Dist. LEXIS 4649, *40-41 (E.D. Pa. Jan. 14, 2016)

(preemption defense weaker for loan assignees than for bank subsidiaries) (citing cases).

In accord, the Second Circuit recently held that although a non-bank could purchase

credit card debt from a national bank, the non-bank could not enforce the bank's interest

exportation rights. *Madden v. Midland Funding, LLC*, 786 F.3d 246, 251 (2d Cir. 2015), *cert.*

*denied*, 136 S. Ct. 2505, 195 L. Ed. 2d 839 (2016). The loan at issue in *Madden* was extended by

a national bank to a New York consumer. *Id*. at 248. The loan carried an interest rate that

exceeded New York's usury limits but was permissible in the bank's home state. *Id*. at 248-49.

The bank then sold the loan to Midland, and the consumer challenged Midland's right to enforce

the bank's interest exportation rights. *Id*. The court concluded that applying New York's interest

cap to Midland would not "significantly interfere" with the bank's powers; therefore, conflict

preemption did not apply. *Id*. at 251-52. The "extension of NBA preemption to third-party debt

collectors such as the defendants would be an overly broad application of the NBA." *Id*.[4]

Thus, the language of the relevant banking statutes, supported by the case law, compels

the conclusion that Congress unambiguously intended to grant interest exportation rights only to

<u>banks</u>. Those rights do not preempt state law as applied to non-bank purchasers.

C.     The "valid when made" rule is irrelevant to whether WebBank may assign its
       interest exportation rights

In an effort to rebut the foregoing precedent, WebBank alleges that it may lawfully

---

[4] Courts have similarly held that preemption rights provided to banks under the Home Owners
Loan Act ("HOLA") (12 U.S.C. §§ 1461 *et seq*.) cannot be assigned because "preemption is not
some sort of asset that can be bargained, sold, or transferred." *E.g., Gerber v. Wells Fargo Bank*,
2012 U.S. Dist. LEXIS 15860,vat *4, 10 (D. Ariz. Feb. 9, 2012).

transfer its interest exportation rights to Avant pursuant to the "valid when made rule." (Dkt. #1, at ¶¶ 40-42, 90.) According to WebBank, that rule provides that "if the interest-rate terms in a bank's original loan agreement were valid when made, then those terms remain valid after assignment, and the assignee may lawfully charge interest at the original rate." (*Id*. ¶ 42.)

As support for this argument, WebBank quotes two Supreme Court cases from the 1800s—*Gaither v. Farmers & Mechanics Bank of Georgetown*, 26 U.S. 37, 43 (1828) and *Nichols v. Fearson*, 32 U.S. 103, 109 (1833). (Dkt. #1, at ¶ 42 n.5.) However, WebBank incorrectly interprets those cases. When the nature of the transactions is examined, it is evident that the valid when made rule applies under circumstances wholly different from those WebBank alleges in this case.

*Gaither* and *Nichols* both address whether promissory notes from valid loans become unenforceable merely because they are transferred (as loan collateral, for example) through a subsequent usurious loan transaction to a new obligee. The cases thus have no bearing on the issue here—whether bank interest exportation rights are assignable—because there is no allegation that WebBank's assignment of the loans to Avant involves a subsequent usurious transaction.

In *Gaither*, a lender (W.W. Corcorran) made a non-usurious loan (Loan 1) to a borrower (Gaither). 26 U.S. at 41-42. The lender then used the promissory note from Loan 1 as collateral to secure a subsequent loan (Loan 2) from a third party (F&M Bank). *Id*. at 41. Loan 1 was "unaffected with usury in its origin" but Loan 2 carried a usurious rate. *Id*. at 41-42. The third-party, who received Loan 1's promissory note by assignment from the first lender, sued the borrower to enforce his obligation under the Loan 1 note. *Id*. As a defense, the borrower asserted

that because the third party received the note in connection with Loan 2, which was usurious, the third party could not enforce the Loan 1 promissory note against the borrower. *Id*. at 42.

The court rejected the borrower's defense and held that "if the note be free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury." *Id*. at 43. *Nichols* involved the same general fact pattern as was at issue in *Gaither*.[5]

In contrast to *Gaither* and *Nichols*, there is no "subsequent usurious transaction" between WebBank and Avant that is alleged to invalidate a consumer's loan obligation. Instead, Avant merely purchased the subject consumer loans from WebBank. (Dkt. #1, at ¶¶ 17, 22, 40.) Accordingly, although WebBank cites to *Gaither* and *Nichols* as primary support for the applicability of the "valid when made rule," neither case provides relevant precedent for the issue presented by WebBank's complaint.[6]

---

[5] In *Nichols*, the lender (Fearson) made a non-usurious loan (Loan 1). *Nichols*, 32 U.S. at 106. The lender then received a usurious loan from a third party (Nichols) by selling the third party the promissory note from Loan 1 at "a discount beyond the legal rate of interest." *Id*. The question presented was whether the obligation under the Loan 1 note was invalidated because the third party received the note through a usurious transaction (the discounted sale of the existing note). The court held that the third party could enforce the note, notwithstanding the subsequent usurious transaction, because, citing *Gaither*, "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction." *Id.* at 109.

[6] In further support of the valid when made rule, WebBank cites to an amicus brief that the United States and the Comptroller of the Currency collectively submitted to the Supreme Court in connection with *Madden v. Midland Funding, LLC, supra*. (Dkt. #1, at ¶ 43.) However, the judiciary—not the executive branch—interprets federal statutes. *Bishop v. Smith*, 760 F.3d 1070, 1090 (10th Cir. 2014). Also, the amicus brief relied upon the misunderstanding of the holding in *Gaither* and *Nichols* that is explained above. *See also Sawyer v. Bill Me Later, Inc.,* 23 F. Supp. 3d 1359, 1369 (D. Utah 2014) (citing *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148-49 (5th Cir. 1981), which, in turn, cites to *Nichols* in support of its misapplication of the valid when made rule).

**IV.     If the Enforcement Action is remanded, this Court should abstain under *Younger v. Harris*, or, alternatively, decline jurisdiction under the Declaratory Judgments Act**

If the Enforcement Action—currently pending in federal court—is remanded pursuant to the Administrator's pending motion, this case is properly dismissed under principles of abstention. Under the *Younger* abstention doctrine, "interests of comity and federalism counsel federal courts to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 237-38 (1984). *Younger* and its progeny require federal courts to abstain from exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding; (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims; and (3) the state proceeding involves important state interests. *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999). If these three elements are met, *Younger* is mandatory and the case must be dismissed, absent extraordinary circumstances. *Id.*

The type of state civil proceeding that implicates *Younger* is a "civil enforcement proceeding[]" initiated by a state entity to sanction the state-court defendant for a wrongful act. *See Brown v. Day*, 555 F.3d 882, 889-90 (10th Cir. 2009) (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 (1975)). Here, the Administrator filed the Enforcement Action pursuant to her authority to enforce the Uniform Consumer Credit Code (UCCC)—precisely the type of proceeding contemplated by *Younger*. (Ex. A, at ¶ 1.)

However, the state proceeding has since been removed to federal court, where the Administrator's motion to remand for lack of subject matter jurisdiction is currently pending. (No. 1:17-cv-00620-WJM-STV, Dkt. #28.) If the Court grants the Administrator's motion, the

12

first element of *Younger* is satisfied, and, upon a showing of the other two elements, abstention is required. *See, e.g.*, *Monster Beverage Corp. v. Herrera*, 2013 U.S. Dist. LEXIS 189315, *14-16 (C.D. Cal. December 16, 2013), *aff'd Monster Bev. Corp. v. Herrera*, 650 Fed. Appx. 344 (9th Cir. 2016) (dismissing complaint based on *Younger* abstention after state case was remanded from federal court).

The second element—that the state proceeding provides an adequate forum—is met by the Enforcement Action. WebBank seeks a declaration that federal law preempts Colorado's usury laws and seeks an injunction against the Administrator from enforcing Colorado's UCCC against loans it ostensibly originates. (Dkt. #1, ¶¶ 85-95). Likewise, Avant raises the same defense in its Notice of Removal. (No. 1:17-cv-00620-WJM-STV, Dkt. #1, ¶¶ 20, 22.) Anticipating this, the Administrator addressed the inapplicability of federal law in her state-court complaint. (Ex. A, at ¶¶ 32-33.)

WebBank's interests thus are aligned with Avant's on the issue of preemption because, if remanded, the state court will necessarily determine whether state law applies to the Avant-purchased loans originated by WebBank. "The rule in *Younger v. Harris* is designed to permit state courts to try state cases free from interference by federal courts," and "[t]he same comity considerations apply … where the interference is sought by [individuals who are] not parties to the state case." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975) (internal quotation marks and citations omitted). Thus, the second element is satisfied.

The final element requires the state proceeding to involve important state interests, which the Administrator's case fulfills. State interests are important when they implicate "matters which traditionally look to state law for their resolution, or implicate separately articulated state

policies." *Amanatullah*, 187 F.3d at 1164-65. Usury laws for non-bank entities are traditionally

regulated by state law or a state's constitution. "All but a small minority of states have capped

interest rates on loans with usury laws, and the price charged for making usurious loans has been

regulated by laws in almost every state.…" 73 A.L.R.6th 571. Colorado has adopted the UCCC,

which applies interest rate caps to consumer credit transactions. *See generally* C.R.S. § 5-1-101

*et seq*. Because the Administrator's complaint involves an issue that traditionally looks to state

law for resolution and implicates state policies, the third element is satisfied. All three *Younger*

elements are present, if the Avant case is remanded to state court, and abstention would then be

mandatory. *See Amanatullah*, 187 F.3d at 1163.

Alternatively, this Court may decline to exercise its jurisdiction under the Declaratory

Judgments Act. 28 U.S.C. §§ 2201-2202. The "existence of a 'case' in the constitutional sense

does not confer upon a litigant an absolute right to a declaratory judgment." *Kunkel v. Cont'l

Casualty Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989). "A federal court generally should not

entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent

issues are likely to be decided in another pending proceeding." *Id.* at 1276. The Tenth Circuit

applies a five-factor test in determining whether a district court should decline jurisdiction:

> [1] whether a declaratory action would settle the controversy; [2] whether it
> would serve a useful purpose in clarifying the legal relations at issue; [3] whether
> the declaratory remedy is being used merely for the purpose of "procedural
> fencing" or "to provide an arena for a race to *res judicata*"; [4] whether use of a
> declaratory action would increase friction between our federal and state courts
> and improperly encroach upon state jurisdiction; and [5] whether there is an
> alternative remedy which is better or more effective.

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

WebBank's complaint raises legal issues, already being addressed by the Administrator

and Avant, that will necessarily be decided in the Avant case. WebBank filed this case after the

Administrator's complaint was filed against Avant, and after Avant removed the case to federal

court; thus, the complaint appears to be used for the purpose of "procedural fencing" or "to

provide an arena for a race to *res judicata*." If the Avant case is remanded to state court, this

declaratory action could increase friction between the federal and state courts and encroach upon

state jurisdiction. No declaration by this Court is necessary to resolve the legal issues raised in

this case. Accordingly, this Court may decline jurisdiction under the Declaratory Judgments Act.

## CONCLUSION

The Administrator respectfully requests that the Court dismiss WebBank's complaint

with prejudice. First, this Court lacks subject matter jurisdiction over the claims because they

seek only to enforce a defense to the Administrator's state law claims against Avant. Second,

Avant, and not WebBank, has standing to litigate. Third, Web Bank's claim fails as a matter of

law because interest exportation belongs to banks only and cannot be assigned. Finally, the court

should dismiss this case pursuant to Younger abstention if the Enforcement Action is remanded

to state court, or, alternatively, should decline to exercise jurisdiction pursuant to the Declaratory

Judgments Act.

CYNTHIA H. COFFMAN
Attorney General

s/ *Nikolai N. Frant*
NIKOLAI N. FRANT
TRINA K. TAYLOR
Assistant Attorneys General
Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: 720-508-6111
Email: nikolai.frant@coag.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Joshua G. Urquhart, Esq.
Gordon & Rees LLP
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Email: jurquhart@gordonrees.com

Mark Edmonde Haddad, Esq.
Collin P. Wedel, Esq.
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Email: cwedel@sidley.com
        mhadad@sidley.com

s/ *Michele A. Kendall*
Paralegal