**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00786-PAB-CBS

WEBBANK,

    Plaintiff,

v.

Julie Ann MEADE, Administrator,
Uniform Consumer Credit Code,

    Defendant.

---

**WebBank's Opposition to Defendant's Motion to Dismiss (ECF No. 17)**

---

**INTRODUCTION**

WebBank is a federally regulated bank, insured by the Federal Deposit Insurance Corporation ("FDIC"). Compl. ¶ 2. WebBank lends to borrowers on a uniform, nationwide basis, using the authority provided by Section 27 of the Federal Deposit Insurance Act ("Section 27"), 12 U.S.C. § 1831d, which expressly preempts the patchwork of state restrictions on interest rates and late fees that otherwise would preclude a nationwide credit program. Congress's preemption of state interest-rate limits ensures that a validly made loan remains valid no matter whether the originating bank holds the loan or whether, as is the case here, the bank chooses to sell the loan. WebBank contracts with marketing and service partners, such as Avant, Inc. ("Avant"), which provide technological support and to which WebBank sells many loans to free up capital. Compl. ¶ 3. Such partnerships are regulated by the FDIC and by banks' home states (here, Utah). *Id.* ¶ 4.

Defendant, Julie Ann Meade (the "Administrator"), challenged this federal framework by bringing suit (the "Enforcement Action") against Avant based on loans that Avant purchased from WebBank. Compl. ¶ 5. The Administrator alleges that those loans—which she tacitly admits were

lawful when WebBank originated them—became unlawful under state law once sold to a non-bank. As WebBank's Complaint sets forth, Section 27 preempts the Enforcement Action, which directly interferes with WebBank's right to lend nationwide under federal law.

The Court should deny the motion to dismiss. *First*, this Court has subject matter jurisdiction under Section 27 and the Supremacy Clause. *Second*, WebBank has already suffered concrete injury from the Enforcement Action, and that injury will only increase if the Court does not enjoin the Administrator's interference with WebBank's rights to lend under federal law. *Third*, under Rule 12(b)(6), WebBank has stated a claim for relief. Section 27 preempts state-law-based challenges to interest rates on "any loan . . . made" by a state-chartered bank, and therefore bars the application of Colorado's interest-rate laws to loans that WebBank has made, no matter whether WebBank holds those loans or sells them. *Finally*, even if the Administrator's *Younger* abstention argument were not premature, it would fail because WebBank is not a party to the Avant action, because that action is not a quasi-criminal one, and because Section 27 facially and conclusively preempts state law.

## ARGUMENT

**I. This Court Has Subject Matter Jurisdiction over WebBank's Complaint.**

This Court has subject matter jurisdiction because WebBank seeks declaratory and injunctive relief under a federal statute—Section 27 of the FDIA—that preempts state law. The law is clear that federal courts have jurisdiction over a lawsuit seeking to enjoin state regulation that is preempted by federal law. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *ANR Pipeline Co. v. Corp. Comm'n of Okla.*, 860 F.2d 1571, 1576 (10th Cir. 1988).

The Administrator argues that WebBank is the jurisdictional equivalent of a state-court defendant challenging the application of state law. But the one case that the Administrator cites for her position, *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 635 F.2d 797 (10th Cir. 1980), holds only

2

that the defendant in a state-court action may not file the reverse action in federal court to create federal jurisdiction over its own dispute where none existed before. Here, WebBank is *not* a defendant in the Enforcement Action, defeating the Administrator's jurisdictional argument. *See Knology, Inc. v. Insight Commc'ns*, No. 3:00cv-723-R, 2001 U.S. Dist. LEXIS 6067 at *22 (W.D. Ky. Mar. 20, 2001) (rejecting same argument because federal plaintiff "not a party" to state action).[1]

WebBank also seeks broader relief than simply ending the Enforcement Action. WebBank has partners other than Avant who are subject to the same challenges as Avant. Compl. ¶¶ 17-18, 83. Thus, WebBank seeks a declaratory judgment and injunctive relief protecting its power to make loans to Colorado residents and to sell those loans—to any buyer—free from prohibitive state interest-rate laws, and those issues cannot be resolved through the Enforcement Action alone.

## II. WebBank Has Standing to Pursue this Action.

A plaintiff has standing under Article III so long as (1) the plaintiff shows an injury-in-fact, that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical,'" (2) the injury is fairly traceable to defendant's conduct, and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "In the declaratory

---

[1] If WebBank were a defendant in the Enforcement Action, moreover, the suit against WebBank would be completely preempted. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8, 11 (2003). The Administrator suggests that *Beneficial Bank* would not apply because WebBank is a state-chartered bank. Mot. at 3. That ignores the express language in Section 27 aimed at preventing discrimination against state-chartered banks, and relies in error on *Thomas v. U.S. Bank N.A.*, 575 F.3d 794 (8th Cir. 2009), an Eighth Circuit case that broke with other appellate courts to hold that Section 27, unlike Section 85, does not completely preempt all state usury claims. *Cf. In re Cmty. Bank*, 418 F.3d 277, 295-96 (3d Cir. 2005); *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007). *Thomas* erroneously concluded that Section 27 preempts only claims where the rate allowed under federal law exceeds the rate allowed by state law. 575 F.3d at 799. That reading is wrong, not binding, and disregards precedent by considering fees to be distinct from interest rates. *See Smiley*, 517 U.S. 735. Even if *Thomas* were correct, it is inapposite because the rate allowed by federal law here exceeds Colorado's interest-rate limits on every loan at issue.

judgment context, . . . 'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1335 (10th Cir. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Here, WebBank alleges a substantial controversy and injury in fact because it lists at least three types of harm caused by the Administrator's action, any one of which is sufficient for standing. *See* Compl. ¶¶ 79-83.

*First*, WebBank is entitled to a share of the economic performance of the loans it has sold to Avant, which it will lose if the Enforcement Action invalidates or impairs the loans. Compl. ¶ 81. The Administrator downplays this injury, Mot. at 1, 4, but "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).[2] WebBank's direct and continuing interest in the loans it has sold also distinguishes this case from *Goleta National Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 719 (E.D.N.C. 2002), where the bank did not allege a continuing interest. *See id.*

*Second*, the Enforcement Action impairs WebBank's ability to originate new loans to Colorado residents. Compl. ¶ 80. By barring WebBank from selling its Colorado loans on the terms it made them, the Administrator prevents WebBank from making the number of loans it otherwise would. The Administrator attempts to minimize this harm, arguing that its action "does not seek to

---

[2] Although the Administrator also characterizes WebBank's decision to cease originating loans through the Avant program to Colorado residents as a "self-inflicted injury," WebBank made its decision only after the Administrator's actions made clear that any further loans originated through the Avant program would become part of the Enforcement Action. Compl. ¶ 28. A party does not forfeit standing to challenge an existing, concrete harm by attempting to mitigate the additional injuries threatened by defendant's enforcement action. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 152-53 (2010) (recognizing separate ground for standing based on costs reasonably incurred to mitigate or avoid a threatened harm for which there is a "substantial risk").

4

prevent *WebBank* from collecting borrower payments" on the loans it makes. Mot. at 4. But WebBank could collect such payments only if it were to hold all of the loans it makes, an antiquated practice known as "portfolio lending." *See* Compl. ¶¶ 18, 45. Holding onto loans for extended periods of time takes significant resources, and, as a result, "severely limit[s] banks' ability to respond to increases in the demand for credit." *Id.* ¶ 45. Selling loans, on the other hand, "allows banks to . . . manage their exposure to loss as well as their compliance with their capital requirements." *Id.* WebBank, whose federal regulator has approved of third-party arrangements to increase consumer credit and reduce risk, depends on its ability to exercise its core banking power of selling loans so that it can originate other loans. *Id.*; *see id.* ¶¶ 55-61.

*Third*, by asserting that purchasers of WebBank's loans cannot collect the interest at the rates applicable when the loans were made, the Enforcement Action depresses the market value of WebBank's other Colorado loans, and adversely affects WebBank's programs with other marketing and service partners in Colorado and nationwide. Compl. ¶¶ 82-83. The Administrator claims this injury is "too attenuated," Mot. at 4, but ignores that "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561; *see also Clinton v. City of N.Y.*, 524 U.S. 417, 432-33 (1998) ("[A]ny petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test."). The Administrator also has threatened further action against another of WebBank's Colorado partners, and has filed suit against a competing marketplace lending program in the action entitled *Colorado ex rel. Meade v. Marlette Funding LLC*, No. 17-cv-00575-PAB-MJW. In all of these ways, the Administrator is attempting to nullify the federal-law basis for WebBank's marketplace lending program. That is a profoundly concrete injury that supports Article III standing.

### III. WebBank Has Stated a Claim for Relief Based on the Violation of Its Federally Protected Right to Originate and to Sell Loans at the Rates Authorized by Section 27.

The Administrator contends that WebBank fails to state a claim because federal law allows states to regulate the interest rates of loans sold by state-chartered banks. The preemption of inconsistent state laws on interest rates, however, is a bedrock principle of banking that Section 85 protects for national banks, and Section 27 extends to state-chartered banks.

#### A. Sections 85 and 86 of the National Bank Act Completely Preempt the Application of State Interest-Rate Laws to National Bank Loans.

Section 85 of the National Bank Act, 12 U.S.C. § 85, preempts state caps on interest rates for any loan that national banks originate, and Section 86 establishes an exclusive federal cause of action for violations of Section 85's interest-rate limits. These provisions were an "indispensable" part of the National Bank Act that gave "advantages to National banks" by allowing them to charge interest rates "that their State competitors" could not. *Tiffany v. Nat'l Bank*, 85 U.S. (18 Wall.) 409, 412 (1873); *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 US. 299, 314 & n.26 (1978). Together, Sections 85 and 86 not only set a maximum interest rate that a national bank may charge, but completely preempt any other State from enforcing a lower maximum interest rate on that bank. *See Marquette Nat'l Bank*, 439 U.S. at 314-15, 318. "To the extent the enumerated federal rates of interest are greater than permissible state rates, state interest-rate laws must, of course, give way to the federal statute." *Id.* at 318 n.31; *see* 12 C.F.R. § 7.4001(b) (same). Preemption under Section 85 applies also to state-law claims challenging late fees and other loan arrangements. *See, e.g., Smiley v. Citibank*, 517 U.S. 735, 744-45 (1996). Preemption under Sections 85 and 86 is "complete" and displaces any "state-law claim of usury against a national bank." *Beneficial Nat'l Bank*, 539 U.S. at 11.

**B.     Section 27 Mirrors Sections 85 and 86, and Completely Preempts the Application of State Interest-Rate Laws to State-Chartered Bank Loans.**

Like Section 85, Section 27(a) preempts state interest-rate caps as to "any loan . . . made" by a state-chartered bank and creates instead a federal law limit. 12 U.S.C. § 1831d(a). Like Section 86, Section 27(b) provides a cause of action to challenge interest rates on such loans under federal law. 12 U.S.C. § 1831d(b). Section 27 thus completely preempts the application of state interest-rate limits to any loan made by state-chartered bank, and so there is "no such thing as a state-law claim of usury" as to a bank's loans.[3] *Beneficial Nat'l Bank*, 539 U.S. at 8.

Contrary to the Administrator's view that national and state banks are different when it comes to the scope of interest-rate preemption, *see* Mot. at 3, Section 27 expressly aims to "prevent discrimination against state-chartered" banks as to interest rates, 12 U.S.C. § 1831d(a), and thus remove the competitive disadvantage that Section 85 had created.[4] As another court explained, "the same express preemption analysis governing Sections 85 and 86 . . . applies to preemption of state usury laws under Section 27 . . . and not only because the two provisions are 'virtually identical' in

---

[3] The Administrator argues that pending legislation to codify the valid-when-made rule should be construed as evidence that Section 27 does not already embody that rule. *See* Mot. at 8 & Ex. B. To the contrary, the bill's sponsor introduced the legislation expressly to correct "uncertainty" caused by the "unprecedented" holding in the *Madden* case. Press Release, Patrick McHenry, *McHenry Introduces Fintech Bills* (July 12, 2016); *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1216 (10th Cir. 2008) (bills often introduced "to correct a misinterpretation" by the courts). "[C]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft*, 535 U.S. 274, 287 (2002).

[4] The late 1970s brought soaring interest rates as a result of a credit crunch, and state banks were hampered in their ability to respond because of "state usury laws." *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826 (1st Cir. 1992). To introduce new sources of credit and encourage lending by state-chartered banks, Congress added Section 27 to the FDIA in 1980, as Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub. L. No. 96-221, 94 Stat. 132 (1980). DIDA put state-chartered banks on an equal footing with national banks with respect to state interest rates. *See* 126 Cong. Rec. 6900, 6907 (Mar. 27, 1980) (statement of Sens. Proxmire and Bumpers, discussing purpose of Title V of DIDA, including Section 27).

substance, policy, and internal logic—the same constitutionally prudential considerations direct the court's analysis of Section 27's preemption of the usury and late fee claims brought under [state] law." *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014); *see Sherman v. Greenwood Trust*, 679 A.2d 652 (N.J. 1996) (applying *Smiley* and holding Section 27 allows exportation of late fees and preempts interest-rate limits); *Stoorman v. Greenwood Trust*, 908 P.2d 133 (Colo. App. 1995) (Section 27 preempts state-law limits on loan fees and interest charges); FDIC Gen. Counsel Op. 10, 63 Fed. Reg. 19,258 (April 17, 1998) ("interest" has similar meaning in Section 27 and Section 85).

The plain language of Section 27 permanently protects not just a state-chartered bank from interest-rate actions based upon state law, but also the validity of the terms of the loans it originates after it sells those loans. This is true for two reasons.

*First*, Section 27 extends preemption not to any loan *held* by a state-chartered bank, but to "any loan . . . made" by such a bank. Section 27's language must be construed reasonably, which includes reflecting the practical reality that making and holding loans are distinct activities. A state-chartered bank can compete with national banks in offering credit nationwide *only* if the loans it makes are protected on their terms; if a lender cannot sell a loan on the terms made, then the loan loses value and the lender's ability to extend credit is impaired.

The Administrator contends that Congress should have more clearly applied Section 27 to non-banks. *See* Mot. at 7-8. This overlooks that the language of Section 27 displaces Colorado law here because it applies to "**any** loan or discount **made**" by a bank. 12 U.S.C. § 1831d(a) (emphasis added). When Congress uses the word "any," it "mean[s] what it says." *United States v. Gonzales*, 520 U.S. 1 (1997). And in extending preemption, without qualification, to any loan "made," Section 27 forecloses any judicial gloss that would limit preemption to only those loans that a state-chartered

bank, *e.g.*, has made and then continued to hold indefinitely, or has made and then held for some minimum period of time.[5] Imposing any such limitations on the scope of preemption under Section 27 would reflect a substitution of policy preferences that only Congress, and not courts or state enforcement agencies, can make. *See A.F. ex rel. Christine B. v. Espanola Pub. Sch.*, 801 F.3d 1245, 1249 (10th Cir. 2015) (Gorsuch, J.) ("[I]t is and ought to be a very rare and highly unusual thing for courts to dismiss the results dictated by Congress's plain statutory command on the ground they are implausible as a matter of 'policy.'").

*Second,* Section 27's expansive preemption of state interest-rate caps as to "any loan . . . made" incorporates the foundational banking law principle that a loan that is "valid when made" cannot become usurious under the interest rate laws of another jurisdiction after it is sold. A state-chartered bank can compete equally with national banks in offering credit nationwide *only* if the loans it makes, no less than the loans a national bank makes, remain protected from interest-rate challenges after sale. If a lender cannot sell the loan on the terms it was made, then the loan loses value and the lender's ability to extend credit is impaired.

The Administrator's contention that the "valid-when-made" rule is "irrelevant" here ignores the fundamental importance of that rule to federal banking law. Mot. at 9-10. When Congress enacted Section 85's earliest statutory antecedent in 1864, *see* 13 Stat. 108, it was already well-established that a bank's power to sell loans was a "necessarily implied" corollary of the power to originate loans because, "in discounting notes and managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes." *Planters' Bank of Miss. v. Sharp*, 47 U.S.

---

[5] Because Section 27 applies to the loan and not just the lender, the Administrator's reliance on cases forbidding the transfer of preemption rights under HOLA is misplaced. *See* Mot. at 9 n.4; *Gerber v. Wells Fargo Bank, N.A.*, No. CV 11-01083-PHX-NVW, 2012 WL 413997, at *4 (D. Ariz. Feb. 9, 2012) (holding that HOLA preemption can be invoked only by federal savings associations).

(6 How.) 301, 322-23 (1848) (holding that a state law that barred a state bank from transferring a loan violates the constitutional prohibition on state impairment of contracts, U.S. Const. art. I, § 10, cl. 1); *see id.* at 321-25; *see Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833) (a "cardinal rule[] in the doctrine of usury" is that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction"); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828) ("[T]he rule cannot be doubted, that if the note be free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury.").[6]

In adopting the NBA—and, later, Section 27—Congress acted against the backdrop of, and preserved for banks, this central and vital aspect of a bank's lending power. *E.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). The United States Solicitor General confirmed that the valid-when-made rule is inherently part of Section 85 just last year, in a brief filed at the request of the United States Supreme Court and on behalf of the United States and the Office of the Comptroller of the Currency, which regulates national banks. The Solicitor General observed that "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and *so the assignee may lawfully charge interest at the original rate.*" Br. *Amicus Curiae* of United States, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at *8 (U.S. May 24, 2016) (emphasis added). The Solicitor General's brief then stated that "[t]he power explicitly conferred on national banks by *Section 85—i.e.*, the power to originate loans at the maximum interest rate allowed by the national

---

[6] Courts still apply the valid-when-made rule in the interest-rate context, recognizing that "[t]he non-usurious character of a note should not change when the note changes hands." *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148-49 (5th Cir. Unit B-1981); *see Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005) ("[T]he common law puts the assignee in the assignor's shoes, whatever the shoe size," so the assignee may collect interest at rate allowed to originating creditor).

bank's home State—*therefore carries with it* the power to use the loans once originated for their usual commercial purposes, which include assignment of such loans to others." *Id.* (emphasis added).

The valid-when-made rule is a practical necessity. As the Solicitor General explained, "[a] national bank's federal right to charge interest up to the rate allowed by Section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate." *Id.* A bank's power to make loans would be destroyed if, due to a patchwork of state interest-rate laws, the bank could not sell them and buyers could not depend on the continuing validity of the terms.

In the face of this history and precedent, the Administrator contends that the Solicitor General, OCC, and multiple federal courts all are guilty of "misunderstanding the holding in *Gaither* and *Nichols*," Mot. at 11 n.6, and that those cases should be construed as applying only to "promissory notes" that are subject to a "subsequent usurious transaction," which purportedly has "no bearing" on the valid-when-made rule. Mot. at 10. For one, the OCC's views on this matter are entitled to substantial deference, *see Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 563 n.7 (9th Cir. 2002),[7] as are the settled views of the other courts before and after *Gaither* and *Nichols* that have held that a loan cannot become invalid simply by changing hands. *E.g.*, *Watkins v. Taylor*, 16 Va. 424, 436 (1811) ("[I]f it was not usury *at the time* when the contract was entered into, no *after* circumstance can make it so."); *Tate v. Wellings*, 100 Eng. Rep. 716, 721 (K.B. 1790) (Buller, J.) ("[I]t must be shewn that it was usurious at the time when it was entered into; . . . no subsequent event can make it usurious."); 1 William Blackstone, Commentaries on the Laws of England 379-80 n.32 (18th London ed., W.E. Dean 1838) ("The usury must be part of the contract in its inception."). The

---

[7] Should the Court harbor any doubt about the views of the OCC and the FDIC on preemption here, it should request their positions. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1395 (2015) ("[I]f faced with a question that presents a special demand for agency expertise, a court might call for the views of the agency); *Rosado v. Wyman*, 397 U.S. 397, 406-07 & n.9 (1970).

Administrator's argument also defeats itself—if a loan remains valid even if later involved in a *usurious* transaction, then, *a fortiori*, it remains valid when it simply changes hands.[8]

The valid-when-made rule thus applies with full force to the loans at issue here. Because Section 27, no less than Section 85, incorporates that cardinal rule, Section 27 preempts the Enforcement Action.

### C. Federal Laws And Regulations Confirm That Under Federal Law, WebBank Is The Lender And The Enforcement Action Is Completely Preempted.

Federal banking law and the FDIC's guidance further confirm that loans sold to or serviced through contracts with third parties, such as Avant, fall within the ambit of "any loan" subject to Section 27. Section 1867 of the Bank Service Company Act provides that, "whenever a depository institution [like WebBank] . . . causes to be performed for itself, by contract or otherwise, any services authorized under this chapter * * * such performance shall be subject to regulation and examination by [an] agency *to the same extent as if such services were being performed by the depository institution itself* . . . ." 12 U.S.C. § 1867(c) (emphasis added); *see also Sawyer*, 23 F. Supp. 3d at 1368 (recognizing that Section 1867 reinforces that the loans at issue here meet "the definition of 'any loan' under Section 27"). The FDIC also requires WebBank to manage its relationships with third parties and subjects those third parties to FDIC's regulation. Compl. ¶ 59. Under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, too, WebBank is the lender. *See* 15 U.S.C. § 1602(g); 12 C.F.R. pt. 1026, Supp. I,

---

[8] The Administrator's argument that the Dodd-Frank Act withdrew preemption for actions against agents of national banks, *see* Mot. 8-9, is incorrect, for two reasons. First, Section 25b(h)(2) explicitly does not affect interest rates. A different subsection states that "[n]o provision of [the Act] shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State . . . where the bank is located, including with respect to the meaning of 'interest' under such provision." 12 U.S.C. § 25b(f). Second, even if Section 25b(h)(2) did apply to interest rates for the NBA, it would not apply here as Avant did not extend loans, and asserts preemption under Section 27 as an assignee of WebBank's loans, not as its "subsidiar[y], affiliate[], or agent[]" under the NBA.

Comment 2(a)(17)(i)-2 (providing that "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the" loan agreement is the "creditor," even if the lender intends from the inception of the loan to "simultaneous[ly]" assign it to a third party).

Such ongoing treatment of WebBank as the lender also defeats the Administrator's attempts to cast Avant as the "true lender." *See* Mot. at 1. Under federal law, the only relevant inquiry in the preemption analysis is to "look to the originating entity (the bank) in the arrangement, and not the ongoing assignee," and the result is the same no matter how "insignificant" a role the bank may play after originating the loans. *Sawyer*, 23 F. Supp. 3d at 1367 (construing *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000)). Here, as in *Sawyer*, WebBank is the "originating entity"; therefore, the loans here are "any loan[s] or . . . other evidence of debt" under Section 27. As in *Sawyer*, WebBank is an FDIC-insured bank that contracted with consumers, funded the loans, held the rights to the receivables for two days, and participates in the performance of the loans. Compl. ¶¶ 68-70. Most importantly, WebBank bears the ultimate regulatory risk of operating its loan programs. *See id.* ¶¶ 23, 61-63. These factors establish, under federal law, that WebBank, not Avant, is the lender. *Sawyer*, 23 F. Supp. 3d at 1369. The Administrator cannot avoid that result with a state-law "true lender" test. *Cf. First Nat'l Bank v. Dickinson*, 396 U.S. 122, 133-34 (1969) (rejecting "state law definitions of what constitutes 'branch banking,'" because "to allow the States to define the content of the term 'branch' would make them the sole judges of their own powers").

## IV.    The Administrator's *Younger* Abstention Argument Fails.

The Administrator's last argument is a hypothetical one. She argues that *if* the court remands the Enforcement Action, then this Court should abstain under *Younger v. Harris*, 41 U.S. 37 (1971). Mot. at 12-15. Abstention, which "is the exception, not the rule," and should be "rarely . . . invoked,

because the federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (quotations omitted), is improper here for four reasons.

*First*, this argument is premature because the Enforcement Action has not been remanded, and there is no state court proceeding to which this Court could defer.

*Second*, even if the Enforcement Action were remanded, abstention would not be appropriate because WebBank is not a party to the Enforcement Action, and WebBank cannot be characterized as "merely an alter ego of a party in state court," *i.e.*, Avant. *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1230 (10th Cir. 2004); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928-30 (1975).

*Third*, abstention would be inappropriate also because the Administrator's state court civil proceeding against Avant is not the sort of "quasi-criminal" action that can support abstention as that doctrine has been clarified and narrowed by *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2013).

*Fourth*, abstention would be improper because preemption under Section 27 is "facially conclusive." *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367 (1989) (suggesting that abstention may not apply where preemption is "facially conclusive"); *see Verizon New Eng., Inc. v. R.I. Dep't of Labor & Training*, 723 F.3d 113, 116-17 (1st Cir. 2013) (citing cases in First, Seventh, and Ninth Circuits). The rationale for this rule is that no important state interest is advanced by permitting a state court to act where Congress has conclusively preempted state law. *E.g.*, *Midw. Gas Transmission Co. v. McCarty*, 270 F.3d 536, 539 (7th Cir. 2001).[9] WebBank's and Avant's preemption claim is facially conclusive. Section 27 expressly preempts "any State

---

[9] Courts within this circuit have endorsed this exception. *See Eagle Air Med Corp. v. Colo. Bd. of Health*, 570 F. Supp. 2d 1289, 1291 (D. Colo. 2008); *Mt. Solutions, Inc. v. State Corp. Commc'n of Kan.*, 966 F. Supp. 1043, 1046 (D. Kan. 1997) ("facially conclusive" preemption exception applied).

constitution or statute" purporting to restrict the interest rate charged on "any loan . . . made" by a state-chartered bank. 12 U.S.C. § 1831d(a). The facially conclusive preemption exception is especially warranted here, where "resolution of the dispute does not require the court to interpret state law or make factual findings." *Bunning v. Kentucky*, 42 F.3d 1008, 1011 (6th Cir. 1994).

## CONCLUSION

For the foregoing reasons, this Court should deny the Administrator's Motion to Dismiss.

Respectfully submitted this 16th day of May, 2017.

| | |
|---|---|
| **KAPLAN RICE LLP** | **SIDLEY AUSTIN LLP** |
| s/ *Howard J. Kaplan* | s/ *Mark E. Haddad* |
| Howard J. Kaplan | Mark E. Haddad |
| Joseph A. Matteo | Collin P. Wedel |
| 142 West 57th Street, Suite 4A | 555 West Fifth Street, Suite 4000 |
| New York, NY 10019 | Los Angeles, CA 91107 |
| Telephone: (212) 235-0300 | Telephone: (213) 896-6000 |
| Facsimile: (212) 235-0301 | Facsimile: (213) 896-6600 |
| Email: hkaplan@kaplanrice.com | Email: mhaddad@sidley.com |
|        jmatteo@kaplanrice.com |        cwedel@sidley.com |

**GORDON & REES LLP**

s/ *Joshua G. Urquhart*
Joshua G. Urquhart
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Telephone: (303) 534-5160
Facsimile: (303) 534-5161
Email: jurquhart@gordonrees.com

*Attorneys for Plaintiff WebBank*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the above and foregoing **WEBBANK'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** was electronically filed with the Clerk of the United States District Court using the CM/ECF system, which will send notification to all counsel referenced below, and/or sent via electronic mail on this the 16th day of May 2017 addressed to:

Nikolai N. Frant
Senior Assistant Attorney General
Uniform Consumer Credit Code
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Tel: 720.508.6111
Email: nikolai.frant@coag.gov


Trina K. Taylor
Assistant Attorney General
Uniform Consumer Credit Code
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Tel: 720.508.6113
Email: trina.taylor@coag.gov

/s/ Karla Freeman
Karla Freeman